**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOR PUBLICATION

Case No. 25-11308 (MG)

(Jointly Administered)

In re:

*In re Virginia Park 1, LLC, et al.,*

                                 Debtors.

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO TRANSFER VENUE

*A P P E A R A N C E S :*

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
*Attorneys for the City of Detroit and the Detroit Land Bank Authority*
150 West Jefferson Avenue, Suite 2500
Detroit, MI 48226
By:    Marc N. Swanson, Esq.
         Ronald A. Spinner, Esq.
         Jonathan S. Green, Esq.

SHERMETA, KILPATRICK & ASSOCIATES, PLLC
*Attorneys for the Wayne County Treasurer*
615 Griswold, Suite 1305
Detroit, MI 48226-3985
By:    Richardo I. Kilpatrick, Esq.

GLENN AGRE BERGMAN & FUENTES LLP
*Proposed Attorneys for the Debtors and Debtors in Possession*
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
By:    Andrew K. Glenn, Esq.
         Jed I. Bergman, Esq.
         Richard C. Ramirez, Esq.
         Malak S. Doss, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

        Pending before the Court is the motion to transfer venue ("Motion," ECF Doc. # 19)

filed by the City of Detroit, Michigan ("City") and the Detroit Land Bank Authority ("DLBA,"

and together with the City, "Detroit") of the above-captioned debtors' ("Debtors") chapter 11 cases.  The Debtors filed an objection ("Objection," ECF Doc. # 34), and Detroit filed a reply ("Reply," ECF Doc. # 42).  The Wayne County Treasurer filed a joinder in the Motion.  (ECF Doc. # 44.)

For the following reasons, the Motion is **GRANTED**.  A separate Order has already been entered.

## I.  BACKGROUND

### A.  Background of Debtors

The Debtors filed two Rule 1007 affidavits ("Decl. 1," ECF Doc. # 3, and "Decl. 2," ECF Doc. # 31), pursuant to this Court's request during a prior hearing.  The first-day declarant is Ronald Castellano, a member of Castellano Member LLC, which in turn is a manager of Debtors Virginia Park 1 and Virginia Park 2.  (Decl. 1 ¶ 1.)  He is also the sole member of Herman Kiefer Member LLC, which is the sole member of Debtor Herman Kiefer Development LLC ("HKD").  (*Id.*)  He is also the owner and founder of Studio Castellano Architect, P.C., a New York City-based architecture and development firm.  (*Id.* ¶ 2.)

The Debtors are entities within a real estate development group led by Studio Castellano Architect, P.C.  (Decl. 1 ¶ 7.)  A simplified organization chart is set out in the second declaration:



(Decl. 2 ¶ 8.)  The Debtors are:

- Virginia Park 1, LLC ("VP1"), which is a "New York foreign limited liability company" with its principal place of business at 165 East Broadway, New York, New York, 10002.  VP1 is incorporated in the state of Michigan.  (Decl. 1 ¶ 7; *see also* ECF Doc. # 1 at 1 (indicating that VP1's principal place of business is at 165 East Broadway).)

    o Exhibit H to Decl. 1 indicates that VP1 operates its business from that address in New York City—165 East Broadway—and that it leases those premises. (Decl. 1 Ex. H.)  The Debtors represent in their voluntary petition for VP1 (ECF Doc. # 1) that VP1's principal place of business is the same address in New York (*id.* at 1).

    o VP1's petition also indicates that VP1 is a single asset real estate debtor with its principal assets located in Detroit.  (ECF Doc. # 1 at 2.)  At oral argument on the Motion, counsel for the Debtors stated that this entry on VP1's petition was

an error because VP1 holds (or held) an option to buy multiple plots of land (not just one), all of which are in Detroit.

- o Detroit explains that VP1's status as a New York "foreign limited liability company" means that it filed for authorization to do business in New York. (Motion at 16–17.) Detroit points out that the New York State Department of State website lists VP1 as having filed for such authorization, though its "Statement Status" was listed as "Past Due" as of the time of the Motion's filing. (*Id.* at 7.) During the hearing on the Motion, the Debtors' counsel agreed that the authorization to do business in New York lapsed on November 30, 2022. (*See also id.* Ex. 12 (screenshot of Department of State website taken around the time of the filing of the Motion, listing VP1's "statement status" as "past due" and noting that the next statement was due on November 30, 2022; this 2022 statement had not been filed as of the Motion's filing).)

- o Page 14 of the voluntary petition for VP1 (ECF Doc. # 1) and Exhibit K to Decl. 1 indicate that the managers of VP1 are Castellano Member LLC and Paris Centre LLC. It is not clear where the signatories for each manager LLC (Ronald Castellano and Simon Elkaim, respectively) operate out of.

- Virginia Park 2, LLC ("VP2"), which is a Michigan limited liability company with its principal place of business at 165 East Broadway, New York, New York, 10002. (Decl. 1 ¶ 7.) VP2 is incorporated in the state of Michigan. (*Id.*)

  - o As with VP1, Ex. H to Decl. 1 indicates that VP2 operates its business from the 165 East Broadway address in New York City and leases this space. The

Debtors represent in their petition for VP2 (case no. 25-11309, ECF Doc. # 1 at 1) that VP2's principal place of business is the same address in New York.

- o VP2's petition indicates that it is a single asset real estate debtor. (Case no. 25-11309, ECF Doc. # 1 at 2.) At oral argument on the Motion, counsel for the Debtors stated that this entry on the petition was also a mistake because, as with VP1, VP2 holds (or held) options to buy multiple pieces of real estate, all of which are in Detroit.

- o VP2 is held entirely by Herman Kiefer JV, LLC, whose listed address is also 165 East Broadway, New York, NY 10002. (*Id.* at 6.)

- o Page 15 of the voluntary petition for VP1 (ECF Doc. # 1) and Exhibit K to Decl. 1 indicate that the managers of VP2 are the same as the managers for VP1.

- o There are no allegations that VP2 filed for authorization to do business in NY, unlike VP1. (*See* Motion at 7.)

- Herman Kiefer Development, LLC ("HKD") is a Michigan limited liability company with its principal place of business in Detroit, Michigan. (Decl. 1 ¶ 7.) It is incorporated in the state of Michigan. (*Id.*)

- o Unlike VP1 and VP2, Ex. H to Decl. 1 indicates that HKD operates its business from an address in Detroit, which it owns. The Debtors do not claim that HKD's principal place of business is in New York.

- o The sole member of HKD is Herman Kiefer Development, LLC. (Decl. 1 Ex. K.)

5

- HKD is a single-asset real estate debtor. (Case No. 25-11310, ECF Doc. # 1 at 2.) Debtors claim HKD has the right to file for chapter 11 in this district because the related cases for VP1 and VP2 are pending here. (*Id.* at 3.)

The Debtors aver in Exhibit I to Decl. 1 that their "substantial assets" are located in Detroit, but that they maintain their books and records at 165 East Broadway, New York, NY 10002.

KC Detroit, LLC, OAIMK LLC, Castellano Member, LLC, Paris Centre LLC and Mark Pantheon Advisors, LLC are non-operational holding companies. (Decl. 2 ¶ 9.) The Herman Kiefer entities—HK JV, HK Member and Debtor Herman Kiefer Development, LLC (collectively, the "HK Entities")—were established "for the purpose of acquiring, holding and developing the Herman Kiefer Hospital complex" (discussed below). (*Id.*) Herman Kiefer JV, LLC ("HK JV") and Herman Kiefer Member, LLC ("HK Member") are non-operational holding companies primarily used for governmental reporting and bank fees, and Debtor Herman Kiefer Development, LLC is the operating entity responsible for the development of the hospital complex site. (*Id.* ¶ 10.) The Virginia Park entities—Debtor Virginia Park 1, LLC, Debtor Virginia Park 2, LLC, non-Debtor Virginia Park 3, LLC (not pictured above), and non-Debtor Virginia Park 4, LLC (not pictured above) (collectively, the "VP Entities")— were established for the purpose of acquiring, holding and developing the neighboring properties (houses and lots) surrounding the hospital complex, in the City of Detroit's Virginia Park neighborhood. (*Id.* ¶ 9.) Of the VP Entities, each is an operating company responsible for the development of each phase of the development of the Virginia Park neighborhood sites. (*Id.* ¶ 11.)

6

HK JV, a Delaware limited liability company, is owned by KC Detroit, LLC, OAIMK LLC, Paris Centre LLC, and Castellano Member, LLC. (Decl. 1 ¶ 13.) HK JV wholly owns Debtor VP2 and HK Member, a Delaware limited liability company. (*Id.*) Debtor VP1 is owned (presumably directly, though it is unclear) by Paris Centre LLC, Mark Pantheon Advisors LLC, and HK JV LLC; and (presumably indirectly) by KC Detroit, "I Michael Kasser, . . . and D.R. Castellano." (*Id.* ¶ 13.)

1.  Assets & Liabilities

As of June 12, 2025, the Debtors' assets consisted of real estate and personal property used in the Debtors' business operations and about $3,500 in cash in accounts held by TD Bank. (Decl. 1 ¶ 16.) There is no indication that any of the real estate or personal property is located in New York, and they submit that their "substantial assets" are located in Detroit. (Decl. 1 Ex. I.). While the Debtors claim that "the Debtors and their non-Debtor affiliates have played an integral role in the revitalization of New York City's Lower East Side and elsewhere" (Decl. 1 ¶ 9), they also specify that the Debtors were all created specifically to perform work in Detroit. (Decl. 2 ¶ 9 ("The Herman Kiefer entities [including HKD] . . . were established for the purpose of acquiring, holding and developing the Herman Kiefer Hospital complex; whereas the Virginia Park entities [including VP1 and VP2] . . . were established for the purpose of acquiring, holding and developing the neighboring properties (houses and lots) surrounding the hospital complex, in the City of Detroit's Virginia Park neighborhood.").) It therefore seems unlikely that the Debtors own any property in New York (apart from a leasehold interest in the 165 Broadway office, though it is possible that a parent entity owns the leasehold interest, in which case neither VP1 nor VP2 has such an interest).

7

The Debtors have no funded debt aside from several intercompany loans in the amount of approximately $3.54 million in the aggregate outstanding. (Decl. 1 ¶ 17.) About $100,000 of the intercompany loans are structured as promissory notes bearing an interest rate of 16% per annum; the rest of the intercompany debt was provided to the Debtors on an interest-free basis by their non-Debtor affiliates and investors. (Decl. 2 ¶ 12.) The Debtors claimed at the time of the petitions' filing that they have no secured creditors and 21 unsecured creditors. (Decl. 1 Exs. C, D.)

### 2. Factors Leading to Bankruptcy

HKD took on the project of redeveloping the Herman Kiefer Hospital complex and surrounding properties located in Detroit's Virginia Park neighborhood (the "Property"). (Decl. 1 ¶ 11.) The project was in partnership with the City of Detroit and the Detroit Land Bank Authority. (*Id.*) The Debtors undertook this project pursuant to two agreements: a Master Agreement to Purchase and Develop Land Development Agreement (the "MDA"), dated May 25, 2016, between Debtor HKD and the City of Detroit; and the First Option to Purchase Property and Agreement for Maintenance of Property (the "First Option Agreement"), dated July 5, 2017, between Debtor HKD and the Detroit Land Bank Authority.[1] The MDA and First Option Agreement are governed by Michigan law. (Motion at 2, 4.) The MDA and the First Option Agreement established certain performance milestones tied to

---

[1] According to Detroit, DLBA and HKD entered into the First Option Agreement to incentivize HKD to redevelop residential real estate around the Property by giving HKD an option to purchase those properties at reduced prices. (Motion at 4.) HKD assigned its rights under this agreement to VP1 and VP2, each of which entered into purchase agreements (the "2019 Purchase Agreement" and the "2021 Purchase Agreement," respectively) with DLBA to purchase residential properties near the Herman Kiefer hospital. (*Id.* at 5.) Both of these agreements are governed by Michigan law. (*Id.* at 5; *see also* Exs. 5, 6 to the Motion.) Both of these purchase agreements obligated VP1 and VP2 to rehabilitate or demolish these properties in accordance with a timetable set out in the First Option Agreement, on pain of having DLBA reconvey the properties back to itself. (*Id.*) According to Detroit, VP1 and VP2 failed to meet contractual deadlines, and DLBA sent notices of default to the Debtors; the Debtors allegedly did not cure these defaults, so DLBA reconveyed some of the sold properties back to itself. (*Id.* at 6–7.)

investment targets, property activation, and construction. (Decl. 1 ¶ 19.) Detroit claims that the Debtors failed to make meaningful progress towards these milestones. (Motion at 3.) The Debtors claim that the City and DBLA did not cooperate with the Debtors and then obstructed the project, causing financial harm to the Debtors and causing the Debtors to miss performance milestones. (Decl. 1 ¶¶ 20–21.) In April 2024, the DLBA sent a Notice of Breach and Demand to Cure letter to Debtor HKD alleging that it had failed to meet several obligations under the First Option Agreement. (*Id.* ¶ 22.) The Debtors claim that they tried throughout 2024 to cure the alleged breaches, but Detroit continued to advance default claims and started to reconvey back to the DLBA some of the properties the Debtors had begun to rehabilitate; Detroit argues that the Debtors simply never cured their defaults. (*Id.* ¶¶ 23–24; Motion at 4.) In September 2024, the City gave formal notice that Debtor HKD had defaulted on its obligations under the MDA, and threatened to exercise its right to reconvey the Property; the Debtors dispute these allegations. (Decl. 1 ¶ 25.) The City then began to exercise purported reconveyance rights in December 2024. (*Id.* ¶ 26; *see also* Motion at 4.) On June 4, 2025, the City issued a final demand for reconveyance, demanding that Debtor HKD "convey the Property to the City . . . within 10 days of this demand." (Decl. 1 ¶ 28.) (Detroit claims this happened on June 5. (Motion at 4.)) The Debtors then initiated these chapter 11 cases on June 10 "to preserve value, protect their rights, and to the extent necessary maintain their ongoing redevelopment efforts." (Decl. 1 ¶ 29.)

Before the Debtors filed for bankruptcy, they were engaged in litigation or pre-litigation negotiations. HKD is engaged in a lawsuit against the Detroit Water and Sewerage Department, which was stayed upon HKD's filing; HKD is also dealing with a pre-litigation demand by the City for reconveyance of the Property, negotiations over which are ongoing.

(Decl. 1 Ex. J.) All three Debtors are also faced with a pre-litigation reconveyance demand by the Detroit Land Bank Authority, negotiations over which are ongoing. (*Id.*) Per the Debtors, the litigation with the Water and Sewage Department relates to attempts by the Department to collect on inaccurate billing statements, which were disputed by the Debtors. (Decl. 2 ¶ 15.) The Debtors joined a class action pending against Detroit which concerns the City's alleged overbilling practices. (*Id.* ¶ 16.) The Debtors are also appealing a tax assessment of valuations of their properties which they claim are inaccurate. (*Id.* ¶ 17.)

### B. Motion to Transfer Venue

Detroit seeks to transfer venue of the Debtors' cases to the U.S. Bankruptcy Court for the Eastern District of Michigan. Detroit points out that the only connections the Debtors have to New York are (1) the fact that one of the Debtors, VP1, filed for authorization to operate in New York State; and (2) the fact that the listed principal places of business for VP1 and VP2 are in New York City. (Motion at 7–8, 16.) The Debtors' principal assets—the properties they are developing—are all in Michigan. (*Id.* at 16.) Moreover, VP1's application for authorization to work in New York seemed to have lapsed by the time of the Motion's filing, and Detroit argues that the Debtors should have filed the proper forms with this Court to establish that VP1 is authorized to conduct business in New York. (*Id.* at 16–17.) (As the Debtors explain in their Opposition, VP1 is currently up-to-date on its filings (*see* Opp. ¶ 4 n.3), but it seems that the Debtors only fixed this issue upon being notified of it by the Motion.) Detroit claims that the Debtors did not adduce evidence showing that VP1 and VP2 actually conducted any business in New York in the 180 days prior to the filing. (*Id.* at 17.) As Detroit puts it, "Virginia Park 1's authority to do business in New York appears to have lapsed, Virginia Park 2 has no obvious ties to New York other than its statement regarding its principal

place of business, and [HKD] admits it has no ties to New York at all (beyond the bankruptcy filing of the other two LLCs)," so venue in New York "does not appear proper" based on the record so far. (*Id.*)

Detroit argues that, even if venue in New York is proper, transfer is warranted. The "next most significant parties," after the Debtors, are the City and DLBA, which are obviously based in Michigan; Detroit argues that most of the witnesses to be relevant to the dispute between the Debtors and Detroit are to be found in Michigan. (*Id.* at 8.) Detroit claims that the majority—83% by dollar amount and 77% by number—of the Debtors' unsecured creditors are Michigan-based. (*Id.* at 8–9.) (The Debtors have not yet filed their schedules, so Detroit works off of the lists of creditors provided with Decl. 1, with two amendments to fix what Detroit believes to be errors in the locations of two of the creditors. (*Id.* at 8–9.)) Moreover, the Debtors "came to Detroit to avail themselves of opportunities there" as "Michigan entities involved in rehabilitation of Michigan properties"; they deal with Michigan-based counterparties, and every relevant contract is governed by Michigan law. (*Id.* at 9.) Because "[a]ll of Debtors' properties are located in the Eastern District of Michigan and it is the most convenient district for the vast majority of interested parties and witnesses," a change of venue is appropriate, as "matters concerning real property have always been of local concern and traditionally are decided at the situs of the property." (*Id.* at 16–17.) These cases concern exclusively Michigan property—and property in a historic district to boot. (*Id.* at 17–18.) Moreover, as the assets, parties, witnesses, and creditors are mainly in Michigan, transferring the case would be in the interest of justice as transfer would promote the efficient administration of the estates, and it would also be convenient for the parties. (*Id.* at 18.)

11

Finally, transfer would be in the public interest because the Debtors' behavior affects the lives of the residents of Detroit. (*Id.* at 18–19.)

### C. Objection to Motion

The Debtors claim that this "is not a case where a debtor took actions to manufacture venue" because the principal places of business of VP1 and VP2 have been the 165 East Broadway address since 2019.[2] (Objection ¶ 6.) Castellano, as the Debtors' "manager and principal, and the individual primarily responsible for the Herman Kiefer Project," has been in New York since 1992, and has run Studio Castellano Architect, P.C. out of the Broadway office since 2007. (*Id.*) The Debtors claim that the New York office is the "nerve center" for the Debtors because all of their "strategy, planning, operations, and management activities occur there," the office "houses all books and records for all Debtors," and the office "employs six to fourteen employees at any given time based on workload and projects at hand."[3] (*Id.* ¶ 7.) However, the Debtors do not provide specifics about *who* works for the Debtors as opposed to the architecture firm or for an unknown number of non-Debtor affiliates which work on projects in New York City and elsewhere. It is unclear which entity employs those

---

[2]     This does not entirely accord with documents in the public record. The New York State Department of State Division of Corporations website shows that VP1 only started filing paperwork in the State in November of 2020 (though it was initially formed in 2019 outside of New York). *Department of State Division of Corporations: Entity Information*, https://apps.dos.ny.gov/publicInquiry/EntityDisplay (last visited July 24, 2025) (search for DOS ID 5881471); *see also* Objection at 31 (screenshot of the same page). "Foreign" (out-of-state) corporations must apply for authority to do business in New York State by filing an Application of Authority. *See* N.Y. BUS. CORP. LAW §§ 1301, 1304 (McKinney). VP1 *cannot* have been operational in New York in 2019, as according to the State's website, it only filed an Application of Authority in *late 2020*. Moreover, VP2 has *never* filed an Application of Authority in New York. It is not necessary for the Court to hold that a foreign corporation *must* file for authorization to operate in New York State to have a principal place of business here, as transfer of the chapter 11 cases is warranted regardless; it merely points out this apparent discrepancy.

[3]     The Debtors provide another affidavit by Castellano in support of their Objection. (Objection at Ex. A.) Castellano does not provide much additional information. He merely asserts, again, that he is the "owner and founder of Studio Castellano Architect, P.C.," a New York-based architecture and development firm; that Studio Castellano has maintained its office at 165 East Broadway since 2007; that that same New York City office has served as the principal place of business for VP1 and VP2 since 2019; that the New York office houses all books and records for all Debtors; that the Debtors' "strategy, planning, operations, and management activities occur" in that office and that their "business and legal decisions are made from the New York office"; and that the NY office "employs six to fourteen employees at any given time." (*Id.* ¶¶ 6–10.)

"six to fourteen employees," who does the "strategy, planning, operations, and management activity" for the Debtors, and what those activities look like. The Debtors point to the signature blocks on several of the exhibits attached to the Motion, which indicate that Castellano signed documents on behalf of the Debtors in New York, to support their claim that the Debtors were run out of New York. (Objection ¶ 6 n.4.)

The Debtors also point to proofs of claim which were filed after the Motion was filed and which, according to the Debtors, show that "half of the Debtors' ten largest unsecured creditors" (which have filed claims thus far) "are located in New York, and 70% of these creditors are located outside of Michigan." (Objection ¶ 12.) However, of the five claims filed by creditors based in New York which the Debtors cite, two are filed by Ronald Castellano himself and two more are filed by entities which are affiliated with Castellano (Castellano Member LLC and Studio Castellano Architect, P.C.). (*Id.*)

The Debtors argue that, since the principal places of business for VP1 and VP2 are in New York and because HKD is an affiliate of VP1 and VP2, venue is proper here under 28 U.S.C. § 1408. (*Id.* ¶ 13.) The Debtors also claim that Detroit does not dispute "that venue in this District is proper" (though this is not evident from the face of the Motion). (*Id.* ¶ 15.)

Next, they argue that Detroit has not borne its "heavy burden of proof" to demonstrate that transfer of venue is merited here, under either a "convenience of the parties" or an "interest of justice" analysis. (*Id.* ¶ 20.) When a venue transfer would "merely shift the inconvenience from one party to the other" or when the equities lean "but slightly in favor of the movant," the debtor's choice of forum should not be disturbed. (*Id.* (internal citations omitted).) The Debtors claim that caselaw does not counsel in favor of venue transfer when the real advantage the movant seeks is "merely to swap one party's perceived home field advantage for another,"

as Debtors claim Detroit is trying to do here.  (*Id.* ¶ 24 (internal citation omitted).)  It is more efficient (and thus in the interest of justice) to keep the cases here, Debtors argue, because "all business and legal decisions" by the Debtors "will emanate from New York," Debtors' counsel is in New York, and there is no reason why this Court cannot apply the laws of other jurisdictions.  (*Id.* ¶ 25.)  The Debtors argue further that keeping the cases in New York will serve the convenience of the parties as the Debtors' principals and their bankruptcy counsel, who are "responsible for managing the Chapter 11 Cases," are located here, Castellano will be the "primary witness in most matters," the Debtors' "corporate headquarters" are in New York, their books and records are here, and their "executive management team" (as yet unidentified by the Debtors) are here too.  (*Id.* ¶ 30.)  According to the Debtors' calculation (*see supra*), most of the major unsecured creditors (who have thus far filed claims) are located outside of Michigan; moreover, all of VP2's and HKD's equity holders are based in New York, and about 53% of VP1's total equity is held in New York.[4]  (*Id.* ¶ 32.)  While the Debtors concede that most of their assets are in Detroit, they claim it is well-settled law that the location of the debtors' assets is not an important venue consideration.  (*Id.* ¶¶ 31, 33.)

Finally, Debtors argue that this Court's prior holding in *In re Project Orange, LLC*, No. 10-12307 (MG), ECF Doc. # 97 (Bankr. S.D.N.Y. June 9, 2010) controls the outcome here. (They cite to an order attached as Exhibit D to the Objection.)  There, this Court denied a motion to transfer venue from the Southern District of New York, where the debtor's asserted principal place of business was located, to the Northern District of New York, where most of

---

[4]     VP1 is owned by Paris Centre LLC, Herman Kiefer JV, LLC, and Mark Pantheon Advisors, LLC.  (ECF Doc. # 1 at 7.)  VP2 is owned entirely by Herman Kiefer JV, LLC.  (Case no. 25-11309, ECF Doc. # 1 at 6.) While Herman Kiefer JV's mailing address may be in New York, it is a Delaware LLC.  *See supra.*  HKD is owned entirely by Herman Kiefer Member, LLC.  (Case no. 25-11310, ECF Doc. # 1 at 6.)  Castellano attested that he is the sole member of Herman Kiefer Member, LLC.

14

its assets were located. (*Id.* ¶ 36.) The Debtors claim that the arguments made by the movant in that case are practically identical to the arguments made here by Detroit and should similarly be rejected. (*Id.* ¶¶ 35–43.) The Debtors also spill ink explaining why a case relied upon by Detroit, *In re Dunmore Homes*, 380 B.R. 663 (Bankr. S.D.N.Y. 2008), is distinguishable. (*Id.* ¶¶ 44–48.) Both of these cases are addressed *infra*.

### D. Reply

Detroit largely repeats the arguments it made in its Motion. Detroit points out that the Debtors are all single-asset Michigan LLCs "formed for the express and only purpose of attempting to rehabilitate historic Michigan real estate properties." (Reply at 2, 4.) Moreover, only one of the Debtors is authorized to conduct business in NYS. (*Id.* at 3–4.) Since these entities are solely in the business of rehabilitating real property in Michigan, venue transfer is appropriate. (*Id.* at 3.) All of the Debtors' allegations about New York City-based operations are, Detroit claims, irrelevant and/or too nonspecific: the fact that Studio Castellano Architect shares office space with the Debtors does not matter as the Studio is not a debtor (nor is the connection between the Studio and the Debtors clear), and while the New York office might employ six to fourteen employees, Detroit points out that this is not the same as alleging that the *Debtors* employ these individuals. (*Id.* 4–5.) (The Debtors also did not file any first day motions regarding employees. (*Id.* at 5 n.6.)) Detroit points out that the only specific statements "regarding the work of these individual Debtors themselves focus solely on the Debtors' activities in Michigan, which makes sense, given the nature of the projects for which the Debtors were created." (*Id.* at 5.)

As for the Debtors' claim that half of their 10 largest unsecured creditors are based in New York, Detroit points out that the Debtors count insiders (Castellano and his controlled

entities) towards this total.  (*Id.*)  When insiders are excluded, the only New York-based creditor listed is a law firm, and the rest are the federal government and Michigan-based entities.  (*Id.*)

Detroit argues that the Debtors were not able to advance any rationale, "save their own convenience and that of their lawyers," for why these real estate companies should be able to file bankruptcy here.  (*Id.* at 2–3.)  But even if venue is proper here, section 1412 allows for transfer of venue even when it is initially proper.  (*Id.* at 6.)  Detroit walks through the cases cited by the Debtors to support its argument; the caselaw is discussed further below.

Detroit provides a list of potential witnesses to contest the Debtors' claim that the only relevant witness—Castellano—lives in New York.  (*Id.* at 9, Ex. B to the Reply.)  The vast majority of these witnesses live in Michigan.  (*Id.*)  Moreover, the Debtors' non-insider creditors are primarily Michigan companies.  (*Id.*)  Detroit also points out that HKD retained multiple sets of Michigan counsel within the past year, and clearly, the Debtors are able to operate in Michigan with little difficulty.  (*Id.* at 9.)

## II.  <u>LEGAL STANDARD</u>

### A.  **Proper Venue Under 28 U.S.C. § 1408**

28 U.S.C. § 1408 states that a chapter 11 case may be commenced in the district court for the district in which "the domicile, residence, principal place of business in the United States, or principal assets in the United States . . . have been located for a hundred and eighty days immediately preceding such commencement."  The statute is written in the disjunctive, making venue proper in any of the listed locations.  *In re Dunmore Homes, Inc.*, 380 B.R. at 670 (citing *In re Segno Commc'ns, Inc.*, 264 B.R. 501, 505 (Bankr. N.D. Ill. 2001) (finding any of the four is jurisdictionally sufficient)).

16

**B. Change of Venue Pursuant to § 1412**

28 U.S.C. § 1412 grants courts discretionary power to transfer a case to another district (or bankruptcy) court if the court finds that the transfer would be in the interest of justice or for the convenience of the parties. Section 1412 is worded in the disjunctive, allowing a case to be transferred under either the interest-of-justice rationale or the convenience-of-parties rationale. *Enron Corp. v. Arora (In re Enron Corp.)*, 317 B.R. 629, 637 (Bankr. S.D.N.Y. 2004). The decision to transfer venue is within the discretion of the court, as evidenced by the use of the permissive "may" in § 1412. *Id.* at 638 n. 8. A court should base its analysis on the facts underlying each particular case. *Id.* at 638; *see also Gulf States Exploration Co. v. Manville Forest Prod. Corp. (In re Manville Forest Prod. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990) (review should be on individualized basis). However, "[t]he power to transfer a case [or proceeding] should be exercised cautiously." *In re Enron*, 317 B.R. at 638 (citing *In re Toxic Control Technologies, Inc.*, 84 B.R. 140, 143 (Bankr. N.D. Ind. 1988)). A debtor's selection of a proper venue is "entitled to great weight" in the consideration of change of venue motions (if the chosen venue is proper). *In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002). As a result, "a heavy burden of proof rests on the moving party to demonstrate that the balance of convenience clearly weighs in his favor." *Lionel Leisure, Inc. v. Trans Cleveland Warehouses, Inc. (In re Lionel Corp.)*, 24 B.R. 141, 142 (Bankr. S.D.N.Y. 1982); *see also Manville*, 896 F.2d at 1390 ("The party moving for change of venue bears the burden of proof and that burden must be carried by a preponderance of the evidence.") (affirming bankruptcy court's refusal to transfer an adversary proceeding); *Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co., Inc. (Matter of Commonwealth Oil Refining Co., Inc.)*, 596 F.2d 1239, 1241 (5th Cir. 1979) ("*CORCO*"). In considering change of venue motions, courts

often look to the criteria established in two circuit court decisions—*In re Manville Forest Prod. Corp.*, 896 F.2d 1384 and *CORCO*, 596 F.2d 1239—to evaluate the interests of justice and convenience of parties.

In *CORCO*, the court affirmed the bankruptcy court's denial of a transfer motion seeking to transfer the chapter 11 cases of an oil refining company debtor and eleven of its subsidiaries from Texas to Puerto Rico. CORCO's principal office and management were located in Texas; most of its assets and creditors were located in Puerto Rico. The parties seeking the transfer to Puerto Rico argued that Puerto Rico had the greatest interest in the case because CORCO was a major supplier of petroleum products to Puerto Rico, its operations were located in Puerto Rico, and many of its creditors were located there. The Fifth Circuit rejected the argument, concluding that the bankruptcy court did not abuse its discretion in deciding to retain the case in Texas. The court concluded that the venue was proper in Texas for several reasons, including that management of all aspects of the debtor's business were handled in Texas, the debtor's problems were financial rather than operational and the people who would work to solve those financial problems or would appear in court were based in Texas. *CORCO*, 596 F.2d at 1241–48.

In *Manville*, the Second Circuit considered the benefits of the current court's familiarity with the case and facts and the lag time of the receiving court's learning curve. *In re Enron*, 274 B.R. 327, 349–50 (Bankr.S.D.N.Y.2002) (citing *Manville*, 896 F.2d at 1391). In *Manville*, the moving party sought to transfer the venue of an adversary proceeding involving Louisiana law from New York, the district handling the main bankruptcy case, to Louisiana. *Manville*, 896 F.2d at 1387–88. The bankruptcy court that originally denied the motion found that while the convenience of the parties and witnesses favored transferring venue, the economic and

efficient administration of the case weighed in favor of retaining venue of the adversary proceeding. The court held that it was inappropriate to shift the burden of the case to another court because the bankruptcy court had already developed a substantial learning curve. *Id*. at 1391. The court also found the change of venue motion untimely. *Id*. On appeal, the Second Circuit held that the lower court had struck the appropriate balance between the economic and efficient administration of the case and the convenience of the parties. *Id*.

The interests-of-justice prong has been characterized as a broad and flexible standard. *In re Enron*, 274 B.R. at 343 (citing *Manville*, 896 F.2d at 1391). The court considers whether (i) transfer would promote the economic and efficient administration of the bankruptcy estate; (ii) the interests of judicial economy would be served by the transfer; (iii) the parties would be able to receive a fair trial in each of the possible venues; (iv) either forum has an interest in having the controversy decided within its borders; (v) the enforceability of any judgment would be affected by the transfer; and (vi) the plaintiff's original choice of forum should be disturbed. *In re Enron*, 317 B.R. at 638–39.

The convenience-of-parties prong has six factors: (i) proximity of creditors of every kind to the court; (ii) proximity of the debtor; (iii) proximity of witnesses necessary to the administration of the estate; (iv) location of the assets; (v) economic administration of the estate; and (vi) necessity for ancillary administration if liquidation should result. *In re B.L. of Miami*, 294 B.R. 325, 329 (citing *CORCO*, 596 F.2d at 1247; *In re Consol. Equity Prop., Inc.*, 136 B.R. 261, 266 (D.Nev.1991)). The consideration given the most weight is the economic and efficient administration of the estate. *Enron*, 274 B.R. at 343. Most cases do not consider liquidation because it is illogical to focus on liquidation contingencies when the goal of the

19

bankruptcy is reorganization. *CORCO*, 596 F.2d at 1248; *In re Enron*, 274 B.R. at 349; *In re B.L. of Miami*, 294 B.R. at 333.

## III.    DISCUSSION

### A.  Whether Venue Here is Proper Under Section 1408

Whether VP1 or VP2 has its principal place of business in New York is the salient question here.  "The question of what constitutes the principal place of business is one of fact . . . .  Central to this determination is where the debtor makes its major business decisions, for this constitutes the principal place of business of a debtor, notwithstanding the physical location of its assets or production . . . .  Thus, the principal place of business of a corporate debtor is primarily the place whence general supervision is given."  *In re Suzanne de Lyon, Inc.*, 125 B.R. 863, 867 (Bankr. S.D.N.Y. 1991) (cleaned up).  A corporation's principal place of business refers "to the place where a corporations officers direct, control, and coordinate the corporation's activities."  *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93, (2010) (construing "principal place of business" in federal diversity jurisdiction statute); *accord* 17 DANIEL R. COQUILLETTE, ET AL., MOORE'S FEDERAL PRACTICE 110.43[2][a], at 110–91 (3d ed. 2014) (The "principal place of business" for bankruptcy venue purposes "is the most important, consequential or influential place where the entity conducts business.  This is likely to be the place where the entity's management decisions are made, but in some cases may be where day-to-day-operations are conducted.").

The Debtors list New York as the principal place of business for VP1 and VP2, based on their assertion that those two Debtors are operated out of New York (the venue hook for HKD is that it is an affiliate of two debtors whose cases purportedly belong in New York).  This seems unlikely to be the case for VP2, as a foreign corporation cannot conduct business in

New York without obtaining a certificate of authority from the New York State Department of State, which is something VP2 did *not* do. N.Y. Bus. Corp. Law § 1301 (McKinney) ("A foreign corporation shall not do business in this state until it has been authorized to do so as provided in this article."); § 1304 (providing process for authorization); *see also In re Suntech Power Holdings Co., Ltd*., 520 B.R. 399, 414–15 (Bankr. S.D.N.Y. 2014) (holding that a foreign debtor did not have its principal place of business in California, despite debtor's assertion to the contrary, in part because foreign corporations cannot operate in that state "without obtaining a certificate of qualification from the California Secretary of State" and citing a California statute parallel to New York's). Moreover, the record does not support a particularized finding that VP2's management or employees operated in New York: as discussed above, it is unclear what work the employees in the New York office do for any of the Debtors and whether the Debtors themselves actually employ any of the employees in the New York office, or whether they are instead employed by an affiliate entity. The record does not specify which entity owns the leasehold interest in the New York office. As for what *is* currently known about the management structure of VP1 and VP2: while Castellano, who is New York-based, controls one of the two managers of VP1 and VP2 (specifically, Castellano Member LLC), both Debtors have another manager—Paris Centre LLC, which seems to be controlled by an individual named Simon Elkaim. There is no testimony concerning where Elkaim resides, or whether Paris Centre LLC is a New York LLC.[5] The mere fact that VP2's books and records are held in the NY office does not, on its own, support a finding that VP2 is operated out of New York, especially in the absence of VP2's filing for the appropriate authorization as a foreign corporation.

---

[5]     In the list of equity security holders submitted with VP1's petition (ECF Doc. # 1 at 6), a New York mailing address is listed for Paris Centre LLC.

VP1 has more of a tie to New York—since it did obtain authorization to operate in the state as a foreign corporation—but it is not clear whether VP1 was allowed to operate in New York during the 180-day period prior to its chapter 11 filing, since its paperwork required to operate in the state lapsed on November 30, 2022. The Debtors only amended the authorization after they filed for chapter 11 protection, likely upon being notified of the lapse by Detroit's Motion. It is unclear, but unnecessary to decide in light of the Court's ruling, whether VP1 was eligible to operate in NY as a foreign corporation in the 180 days prior to its chapter 11 filing.

Even assuming *arguendo* that VP1's (and/or VP2's) principal place of business is in New York, transfer is still merited under section 1412.

**B. Transfer Is Merited Under Section 1412**

Assuming *arguendo* that VP1's principal place of business is in New York and that VP2 and HKD can both file in New York as related cases, transfer to the Eastern District of Michigan is still warranted, even though the Debtors' choice of venue is entitled to great weight.

1. Interest of justice

The factors to consider when deciding whether the interests of justice favor transfer mostly cut in favor of transfer.

*a. The economic and efficient administration of the estate*

Courts evaluating the economic and efficient administration of the case have looked at "the need to obtain post-petition financing, the need to obtain financing to fund reorganization, and the location of the sources of such financing and the management personnel in charge of obtaining it." *In re Enron*, 274 B.R. at 348 (internal citations omitted). There is no testimony

concerning post-petition financing before the Court at present, nor is there any clear explanation of where the activities of the Debtors actually take place: even though the Debtors claim that VP1 and VP2 are run out of New York City, they do not allege any link between HKD and New York City, and it seems, from the record before the Court, that HKD—which is in charge of the large hospital redevelopment project in Detroit and the operations of which therefore seem highly likely to affect the financing of this case—operates mostly if not entirely out of Detroit.

The main assets of each of the Debtors are pieces of real estate located in Detroit. This Court previously examined the location of a debtor's main asset when determining where post-petition financing would likely originate, and found that such financing was just as likely to come from the district where the asset could be found as in the debtor's domicile, as due diligence would have to be conducted at the site of the asset—at least when that asset was a piece of real estate. *In re Dunmore Homes, Inc.*, 380 B.R. at 673; *see also In re Pinehaven Assocs.*, 132 B.R. 982, 989 (Bankr. E.D.N.Y. 1991) ("There is ample support for the proposition that a real estate case . . . can be most efficiently and economically administered in the bankruptcy court closest to its major asset, and that the Chapter 11 case can best unfold there . . . . The Debtor has presented no compelling reason to keep this real estate investment partnership case in this district, far from the site of its single asset and its creditors.") (collecting cases). While the Court was aided in its decision in *Dunmore* by the fact that the debtor's management and employees were located at the site of the property (and not in the debtor's domicile), the Court still held, in line with *Enron*, that, "where a debtor's assets consist solely of real property cases have held that transfer of venue is proper because matters concerning real property have always been of local concern and traditionally are decided at the situs of the property." *Id.* (citing *In re Enron*, 284 B.R. 376, 392 (Bankr. S.D.N.Y. 2002), collecting cases).

As noted above, it is unclear where the Debtors really operate, but each of the Debtors was created for the sole purpose of developing real estate in Michigan and each is mired in litigation (or pre-litigation negotiations) in Michigan, which will likely affect the availability of post-petition financing. Because of the fuzziness of the current record concerning the Debtors' operations, the importance of the location of the real estate (especially where, as here, all the Debtors filed as single asset real estate debtors[6]), and the purpose of each of the Debtors is the development of property in Detroit, this prong cuts in favor of transfer.

### b. Judicial economy

The interests of judicial economy would be served by transfer. As in *Dunmore Homes*, there is at least one case pending against the Debtors (which has been stayed—the case against the Detroit Water and Sewage Department[7]) in Michigan state court which will doubtless affect the Debtors; this counsels in favor of transfer. *In re Dunmore Homes*, 380 B.R. at 674. Moreover, every relevant contract which has been raised thus far is governed by Michigan law, which also cuts in favor of transfer. *Id.* These cases are at an early stage, so there is no steep learning curve a Michigan court must scale in case of transfer (not that a learning curve would be a "substantial deterrent to transferring the case," *id.*). In *CORCO*, the court emphasized the interest of the receiving venue in the outcome of the case. *CORCO*, 596 F.2d at 1248. The Debtors' operations affect exclusively Michigan: their assets and operations are in residential and other construction and development within Michigan, giving Michigan a strong interest in the impact of the disposition of the case. *See In re Dunmore Homes*, 380 B.R. at 674.

---

[6]     Even if VP1 and VP2 are not single-asset real estate debtors, as their counsel claimed during oral argument on the Motion, since they were created for the sole purpose of buying and developing property in Detroit, this does not change the analysis.

[7]     The Department is one of the Debtors' largest claimants, and supports Detroit's venue transfer motion. (*See* Motion at 9.)

Moreover, the key questions will be ones of Michigan law. Finally, many of the non-insider creditors (specifically, those creditors which are not controlled by Castellano) are located outside of New York and are in Michigan. *See In re EB Cap. Mgmt., LLC*, No. 11-12646 (MG), 2011 WL 2838115, at *4 (Bankr. S.D.N.Y. July 14, 2011) (looking at the location of creditors when determining whether transfer would promote the efficient administration of the estate). This prong cuts in favor of transfer.

### c. Fair trial

There is no reason why the Debtors would not be able to receive a fair trial in Michigan just as they would be able to here. This factor is neutral.

### d. Interest of the forum

Michigan has a much stronger interest than New York does in the resolution of these cases and any related adversary proceedings. This cuts in favor of transfer.

### e. Enforceability of judgments

There is no reason why the enforcement of judgments would be affected by transfer. This prong is neutral.

### f. Debtors' original choice of forum

While courts ordinarily defer to the debtor's choice of forum, the connection between the Debtors and New York is slim at best. Even if this factor cuts in favor of this Court's retaining jurisdiction, it is outweighed by the others listed above.

These Debtors' chapter 11 cases should be transferred to Michigan in the interest of justice.

2. <u>Convenience of the parties</u>

These cases should also be transferred to Michigan for the convenience of the parties. While insider-creditors are in New York, the listed ones so far seem to be Castellano and the entities he (very likely) controls; when looking at *unique* (and especially non-insider) creditors, most are outside of New York and many are in Michigan. While this Court has not found binding caselaw which expressly instructs the Court to look only at non-insider creditors when assessing a venue transfer motion, the fact that it seems highly likely that all of the identified insiders are the same person or controlled by the same person (Castellano) means that a transfer of venue would likely only affect *one* person out of the pool of interested creditors. The location of an entity's stockholders can factor into the inquiry of proximity of creditors, *see In re Certa Dose, Inc*., No. 21-11045 (LGB), 2021 WL 5177376, at *17 (Bankr. S.D.N.Y. Nov. 4, 2021), and the Debtors urge the Court to keep the case in New York because all of VP2's and HKD's shareholders, and most of VP1's shareholders, are here (or so they claim). (Objection ¶ 32.) However, it is not clear where Herman Kiefer JV, LLC should be considered to be "located": while it may have a mailing address in New York, it is a Delaware LLC. Nor is there evidence before the Court regarding the locations of Paris Centre, LLC or Mark Pantheon Advisors, LLC (the former has a New York mailing address and the latter a Connecticut one, *see* ECF Doc. # 1 at 6). Regardless, only three shareholders are implicated, not all of which are New York-based; they do not outweigh the large number of unique, non-New York creditors.

HKD has no connection to New York and thus is most proximate to the Michigan court. *If* VP1's and VP2's principal places of business are actually in New York, it still would not inconvenience them to go to a Michigan court, as they were created for the express purpose

of operating in Detroit and thus are functionally proximate. The fact that the Debtors' principal (Castellano) and *some* of their attorneys are based in New York should not outweigh the fact that Detroit provides a long list of potential witnesses who have relevant knowledge, most of whom are closest to the Michigan court (and not this Court). The Debtors' assets are entirely in Michigan. As discussed above, Michigan is the best place to administer the debtors' estates.

### 3. *Project Orange* and *In re Patriot Coal*

The Debtors rely heavily on this Court's prior order in *Project Orange Associates, LLC* to argue against transfer. *In re Project Orange Associates, LLC*, No. 10-12307 (MG), ECF Doc. # 97 (Bankr. S.D.N.Y. June 9, 2010). In that case, Syracuse University filed a motion seeking to transfer venue of the chapter 11 case of Project Orange Associates LLC to the Northern District of New York. Syracuse argued that, though venue in the Southern District was proper, transfer was warranted because there was ongoing state court litigation in the Northern District; the Court dismissed this argument. *Id.* at 2. Syracuse also relied on the fact that the debtor's sole asset was based in Syracuse and the presence of two of the debtor's creditors in Syracuse. *Id.* However, these facts were, in the Court's eye, outweighed by the fact that the debtor's employees and books and records were in New York City, and the Court ruled that the creditors' convenience was not sufficient to overcome the presumption in favor of the debtor's choice of forum. (*Id.*)

The Debtors rely on this two-page non-binding order and argue that it should apply instead of *In re Dunmore Homes*. Not so. First, the debtor in *Project Orange* was not a single-asset real estate debtor, unlike each of the Debtors here; the fact that the Debtors are single-asset real estate debtors (or are, at least, solely in the business of the development of real estate

in Michigan) cuts in favor of transfer. *See supra.* Second, unlike in *Project Orange*, the Debtors have not made a clear showing that *their* employees, or *any* of their operations, are based in New York. Third, it is not even clear that venue is proper in New York, unlike in *Project Orange* (where the movant conceded the point). Finally, *Project Orange* applied *Dunmore Homes* and did not overrule it.

The Debtors also rely on *In re Patriot Coal Corp.*, 482 B.R. 718 (Bankr. S.D.N.Y. 2012) for the proposition that courts should not entertain motions to transfer venue when the goal is to "swap one party's perceived home field advantage for another." (Objection ¶ 24.) This is not what Detroit is doing with its Motion. In *Patriot Coal*, the court was faced with an argument, advanced by one constituency out of many involved in the case (a subsection of coal workers), that transfer to the venue which housed *that* constituency (West Virginia) would be fair as judges in that venue would "understand" that constituency better. *Id.* at 749–50. The court rejected this argument, finding that the "analysis regarding the appropriate venue for these cases must focus on the interests and convenience of *all* parties," not just a single constituency which felt that it could get a more empathetic ear in its home venue. *Id.* at 753. *Patriot Coal*, however, is distinguishable: it featured debtors which were *not* single-asset real estate entities, competing transfer motions, creditors scattered across multiple jurisdictions, and a clear principal place of business (in Missouri, not West Virginia). The present Debtors' cases are much simpler: the record before the Court shows that the substantial majority of their ties are to Michigan, *not* New York. Detroit has a much stronger argument, and more evidence to support it, in favor of venue transfer than did the subsection of coal workers in *Patriot Coal*.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** the Motion.  A separate Order has already been entered transferring the cases to the United States Bankruptcy Court for the Eastern District of Michigan.

DATED:        July 25, 2025

*Martin Glenn*
_____
MARTIN GLENN
Chief United States Bankruptcy Judge
